UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) | |
| v. | ) ) | Crim. No. 08-145(HHK) |
| LARRY BRINSON-SCOTT | ) ) ) ) | |

**DEFENDANT'S MOTION TO SUPPRESS
PHYSICAL EVIDENCE AND STATEMENTS**

Defendant, Larry Brinson-Scott, through undersigned counsel, respectfully moves the Court to Suppress all Physical Evidence Seized and Statements taken in violation of the Constitution. Tangible evidence and statements were taken in relation to Mr. Brinson-Scott's arrest on April 10, 2008. The motion to suppress is made pursuant to Fed. R. Crim. P. 12(b)(3) and is supported by the discussion below. An evidentiary hearing on this motion is respectfully requested.[1]

### BACKGROUND

**1.    Factual Background**

On or about March 30, 2008, Mr. Brinson-Scott was a passenger along with his brother, Jonathan Cayol in a vehicle that was driven by a friend. As the their car approached the area of 17th and E St. NE, Washington, D.C., the Metropolitan Police Department had established a vehicle

---

[1] In the event counsel learns of new information supporting the need for further motions, counsel respectfully reserves Mr. Brinson-Scott's right to later supplement this motion and/or file additional motions which may be appropriate in his case.

check point.[2] According to the search warrant affidavit, the check point was "A Safety Compliance Checkpoint."

Without any reason or justificaiton, beyond the "safety compliance checkpoint", the officers stopped the car driven by Mr. Brinson-Scott's friend, who was driving the vehicle. After ordering the stop, the driver was ordered to produce his driver's license and registration. When he was unable to do so, the officers order all three occupants out of the car. After Mr. Cayol, Mr. Brinson-Scott and the driver were ordered out of the car, the officers questioned them. Mr. Brinson-Scott was asked his name and address and asked to confirm the address of Mr. Cayol.

For some unknown reason, one of the seizing officers "asked for consent to pat []down" Mr. Cayol, regardless of the fact that he was not driver. Mr. Cayol allegedly consented. While the officer was "patting" Mr. Cayol, he felt an object that appeared to be a gun. The officer recovered a silver Smith and Wesson 40 caliber handgun. Thereafter, Mr. Cayol was placed under arrest. When the car that Mr. Brinson-Scott was a passenger was stopped and he was subsequently ordered out of the car, the police had no probable cause or even reasonable articulate suspicion that he was involved in a crime, was a suspect in a crime or was about to commit a crime.

On April 2, 2008 MPD Officer Michael Kasco submitted an affidavit in support of an application for a search warrant. In the warrant affidavit Officer Kasco recited the preceding facts concerning the "safety compliance checkpoint" and the recovery of a firearm from Mr. Jonathan Cayol. Based on the events of March 30, 2008 at the "safety compliance checkpoint", Officer Kasco arrived at the conclusion that a warrant should be issued for apartment 203 located at 3411 A. St.,

---

[2] The facts concerning the events of March 30, 2008 and the "Safety Compliance Checkpoint" are based on the Affidavit in Support of an Application for a Search Warrant that was authored by MPD Officer Michael Kasco. The affidavit is attached as exhibit number 1.

SE.  The objective in securing the search warrant was for the seizure of "any and all firearms, magazines, ammunition, holsters, scopes/laser aiming devices, firearm accessories, and any other contraband."

On April 10, 2008 at approximately 3:05 in the afternoon, MPD officers executed the search warrant for apartment 203 at 3411 A. St. SE.  When the officers knocked on the door, Mr. Brinson-Scott answered the door and let the officers into the apartment.  The ensuing search of the apartment resulted in the recovery of approximately 67 grams of powder cocaine, 183 grams of cocaine base ("crack"), $2,512.00 dollars and drug paraphernalia.  Mr. Brinson-Scott was the only person in the apartment and he was arrested and charged with the illegal contraband.

On May 15, 2008 a Federal Grand Jury returned an Indictment against Mr. Brinson-Scott charging him in a two-count indictment with Unlawful Possession with Intent to Distribute 50 Grams or More of Cocaine Base in violation of 21 U.S.C. § 1841(a)(1) and 841(b)(1)(A)(iii), and Unlawful Possession with Intent to Distribute Cocaine in violation of 21 U.S.C. 841(a)(1) and 841(b)(1)©.

**ARGUMENT**

**I.   THE PHYSICAL EVIDENCE RECOVERED ON APRIL 10, 2008, MUST BE SUPPRESSED AS THE TAINTED FRUIT OF AN ILLEGAL SEARCH AND SEIZURE.**

The Fourth Amendment of the United States Constitution requires that all searches and seizures be based on individualized suspicion of wrongdoing.  Terry v. Ohio, 392 U.S. 1 (1968).  The Supreme Court has established that stopping a car at a vehicle checkpoint constitutes a seizure within the Fourth Amendment.  Indianapolis v. Edmond, 531 U.S. 32, 40 (2000).  It has recognized very limited circumstances under which such checkpoints are Constitutionally permissible.  See United States v. Martinez-Fuerte, 428 U.S. 543, 556 (1976) (upholding vehicle checkpoints near the

border for the express purpose of intercepting illegal aliens); Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 450 (1990) (upholding roadblocks aimed specifically at apprehending drunk drivers). The Court has made clear, however, that when the primary purpose of a checkpoint is "to uncover evidence of ordinary criminal wrongdoing," the Fourth Amendment is violated. Edmond 531 U.S. at 42 ("We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes."). It goes without saying that a "random spot check" of vehicles that constitutes "standardless and unconstrained discretion" is similarly impermissible. Delaware v. Prouse, 440 U.S. 648, 661 (1979).

In the instant case, the alleged "safety compliance" checkpoint was unconstitutional because it did not fall within any of the very narrow exceptions to the individualized suspicion requirement for a seizure. Unlike the checkpoints in Martinez-Fuerte and Sitz, this checkpoint did not have any express purpose other than the general detection of illegal activity, which the Supreme Court clearly prohibited in Edmond. The police did not observe Mr. Brinson-Scott, the driver, or Mr. Cayol committing any violations of law when their car was pulled over. They stopped the vehicle without any individualized suspicion whatsoever. Without a specifically tailored purpose other than generalized crime detection in place, the checkpoint was illegal. In addition to not having a permissible purpose, the checkpoint also did not have any specific standards or regulations detailing who the police were to pull over, how that was determined, or the procedures to be followed when the seizure occurred.

The seizure of the car Mr. Brinson-Scott was a passenger was illegal because it was done without individualized suspicion and did not fall into any of the clearly defined exceptions for individual suspicion in the context of vehicle checkpoints. Because the seizure of the car was illegal,

the ensuing search and arrest of Mr. Johnathan Cayol was illegal. Since Mr. Brinson-Scott was a passenger in a car that was illegally seized, his Fourth Amendment right to be free of and unreasonable search and seizure was infringed. Prouse, 440 U.S. 648, 653; see Brendlin v. California, 127 S.Ct. 2400, 2410 (2007)

Accordingly, any and all fruits of that initial seizure and ensuing search must be suppressed i.e. the contraband seized as a result of the warrant that was issued for a search of the apartment that Mr. Cayol and Mr. Brinson-Scott share. Wong Sun v. United States, 371 U.S. 471 (1963).

II. **ALL STATEMENTS MADE BY MR. BRINSON-SCOTT ON APRIL 10, 2008, MUST BE SUPPRESSED BECAUSE THEY WERE INVOLUNTARY AND MADE IN VIOLATION OF MIRANDA.**

The government has alleged that Mr. Brinson-Scott made a statement at some point during the execution of the search warrant. According to the PD 163, Mr. Brinson-Scott stated "It's not mine" and "I don't know anything about it." Before introducing any statements at trial, either in its case-in-chief or as impeachment or rebuttal evidence, the government bears the burden of proving that the statements were voluntary. See Lego v. Twomey, 404 U.S. 477 (1972). The test for voluntariness is whether a statement is the "product of an essentially free and unconstrained choice by its maker." Culombe v. Connecticut, 367 U.S. 568, 602 (1961). The determination of whether a statement was made voluntarily "requires a careful evaluation of all the circumstances of the interrogation." Mincey v. Arizona, 437 U.S. 385, 402 (1978). The Court must consider the "totality of the circumstances" in deciding whether the defendant made his statement voluntarily. Fikes v. Alabama, 352 U.S. 191 (1957); see also Gallegos v. Colorado, 370 U.S. 49 (1962) (determination of whether an accused's statement was made involuntarily so as to render it inadmissible requires close scrutiny of the facts of each individual case); Clewis v. Texas, 386 U.S. 707 (1967).

Specifically, the Court must examine the efforts to overbear the defendant's free will in relation to his capacity to resist those efforts. Davis v. North Carolina, 384 U.S. 737 (1966); Culombe, 367 U.S. at 607. The Court must examine the defendant's "background, experience, and conduct," North Carolina v. Butler, 441 U.S. 369, 375 (1979), to determine whether his statements were the product of a rational intellect and a free will. Blackburn v. Alabama, 361 U.S. 199, 208 (1980). Here, the evidence at a hearing will show that any statements made by Mr. Brinson-Scott were made involuntarily and thus must be suppressed under the Fifth Amendment. Even if the statements were made voluntarily, Miranda requires suppression of Mr. Brinson-Scott's statements during the government's case-in-chief because he was not adequately apprised of his right against self-incrimination prior to undergoing custodial interrogation. See, e.g., Pennsylvania v. Muniz, 496 U.S. 582, 110 S. Ct. 2638, 2643-44 (1990). A person is in "custody" under Miranda when he "has been . . . deprived of his freedom of action in any significant way." Miranda v. Arizona, 384 U.S. 436, 444 (1966). Whether a person is in custody depends upon "how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984). "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

The government bears the heavy burden of establishing that proper Miranda warnings were given to the defendant and that an intelligent and voluntary waiver of those rights occurred prior to questioning of the defendant. Miranda, 384 U.S. at 475. In the case, Mr. Brinson-Scott was clearly in custody when he allegedly made a statement, as he was told to remain in the living room

during the execution of the search warrant. The actions of the police in eliciting a statement from Mr. Brinson-Scott at that time therefore constitute custodial interrogation, and the statement must be suppressed.

**CONCLUSION**

For the foregoing reasons, and any other reasons that the Court may deem just and reasonable, Mr. Brinson-Scott requests that the Court suppress the drugs found during the execution of the search warrant and all statements made by Mr. Brinson-Scott on April 10, 2008, along with any other evidence or statements obtained by the officers in violation of the Fourth and Fifth Amendments. Mr. Brinson-Scott respectfully requests an evidentiary hearing on this motion.

                                Respectfully submitted,

                                A. J. KRAMER
                                Federal Public Defender


                                _____/s/_____
                                Carlos J. Vanegas
                                Assistant Federal Public Defender
                                625 Indiana Avenue, N.W., Suite 550
                                Washington, DC 20004
                                (202) 208-7500

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Crim. No. 08-145(HHK) |
| ) | |
| LARRY BRINSON-SCOTT ) | |

**ORDER**

That upon consideration of Larry Brinson-Scott's Motion to Suppress, all physical evidence seized and all statements made on April 10, 2008, it is hereby **ORDERED**

**THAT THE MOTION IS GRANTED**

**SO ORDERED.**

_____                                       _____
DATE                                                         HENRY H. KENNEDY JR.
                                                                  UNITED STATES DISTRICT JUDGE

Carlos J. Vanegas
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C. 20004

William Woodruff
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530

# Exhibit

# 1

PD 274 4/89

**METROPOLITAN POLICE DEPARTMENT**
Washington, D.C.

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANT

☐ UNITED STATES DISTRICT COURT     ☒ SUPERIOR COURT OF THE DISTRICT OF COLUMBIA



AFT # 803

The entire premise located at 3411 A Street SE in Washington, DC. The premise is a 3-level red brick apartment complex with a green yawny displaying the following address: 3411. The front entrance door to the apartment is tan in color with a gold in color doorknock. Within the gold doorknock is a brown plate containing white numbers (203).

1. Your affiant Officer Michael Kasco is a member of the Metropolitan Police Department (1st District), First District Street Crimes Unit. I've also been assigned to 1st District Focus Mission Team, Auto Theft and PSA 104. I'll been employed since 2004 and during this time; I've been involved in the arrests of hundreds of narcotic and/or firearm violators. As a member of the Street Crimes Unit; our unit is detailed to high crimes areas to include: Robberies, homicides, high drug areas/activities and other violent crimes within the 1st District. The patrol area in which I patrol consists mostly of public housing in which open air drug markets are prevalent. I've arrested and assisted in the arrests of people for firearms violations which have also led to successful prosecutions. I've been activity involved in over 40 search warrants conducted by the Street Crimes Unit and The Focus Mission Team through MPDC, which have led to successful arrest and prosecution. I've used information obtained from citizens, and other sources of information to pursue narcotic and firearm related crimes. I have spent many hours in observation posts to observe the methods of persons involved in selling and storing narcotics.

2. Based on your affiant's experience, training and participation in narcotics and firearm search warrants, I have personal knowledge of persons involved in illegal activities. Those involved in illegal narcotics trafficking keep additional drugs and maintain books, records, notes, ledgers, documentation and other papers relating to the ordering and sales of their narcotics. I know that the aforementioned items are generally maintained where persons involved in criminal activity can have access to them, to include their residences and other stash locations where they can have access to them for future distribution purposes. They also keep their narcotics

_____
Affiant

_____
Element

_____
United States Attorney

Subscribed and sworn to before me this _____ Day of _____

_____
Magistrate
United States District Court

_____
Judge
Superior Court of the District of Columbia

PAGE  1  OF  4  PAGES



PD 274 4/89

**METROPOLITAN POLICE DEPARTMENT**
Washington, D.C.

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANT

☐ UNITED STATES DISTRICT COURT      ☐ SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

(a) It is common for narcotics traffickers/drug dealers to maintain for immediate use one or more firearms for the purpose of protecting their narcotic business. In additional in possessing firearms they may also have the following: Magazines, ammunition scopes/laser aiming devices, speedloaders, rifle slings, holsters, weapon safes and weapon cleaning supplies inside their residence. These items are often retained inside their residence long after the person is arrested and the firearm is seized available for future use in another weapon.

(b) Since Ammunition is not sold or manufactured in the District of Columbia it is a scarce and valuable commodity. Your affiant has arrested many criminals with partially filled magazines in their possession. Some of them want to keep additional cartridges of ammunition available inside their residence in case they have to throw away their weapon during a pursuit, they will have the ammunition available when they obtain a new weapon.

### FACTUAL BACKGROUND

Officers assigned to the Street Crimes Unit working the Power Shift tour of duty conducted a Safety Compliance Checkpoint at the intersection of 17th & E St. NE. At some point during the checkpoint; officers observed a gold in color vehicle and asked the driver for his license & registration. The driver failed to provide the officers a registration. The vehicle was occupied by a driver, front seat passenger and rear passenger. All individuals were asked to step out of the vehicle.

_____   _____
Affiant                      United States Attorney

_____
Element

Subscribed and sworn to before me this _2nd_ Day of _April_ _2008_

_____   _____
Magistrate                   Judge
United States District Court  Superior Court of the District of Columbia

PAGE __2__ OF __4__ PAGES

PD 274 4/89

**METROPOLITAN POLICE DEPARTMENT**
**Washington, D.C.**

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANT

☐ UNITED STATES DISTRICT COURT  ☐ SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

---

The rear passenger (Cayol, Jonathan) was asked for consent to pat him down and Mr. Cayol consented. As the officer was patting him; the officer felt what appeared to be a handgun in the coat pocket. Recovered from Mr. Cayol's coat pocket was a silver Smith & Wesson 40 caliber handgun. The handgun was loaded with 1 round in the chamber and another 5 rounds of 40 caliber ammunition in the magazine.

The defendant (Cayol, Jonathan) has the following PDID # 502317. This is Mr. Cayol 2nd offense in regards to a CPWL Arrest. Mr. Cayol was arrested on 11/7/02 for CPWL.

The following steps were taken to ensure that Mr. Cayol, Jonathan is a resident at the target premises:
1). On the scene during his arrest; Mr. Cayol provided the officers on the scene the following address: 3411 A St. SE #203.
2). Mr. Cayol had in his possession a DC Identification Card that listed the following address: 3411 A St. SE #203.
3) His brother Mr. Larry Scott also comfirmed Mr. Cayol's address at 3411 A St. SE #203. Mr. Scott stated that Mr. Cayol lives with him.

REQUEST

Based on the facts set forth in this affidavit, the affiant believes that probable cause exists and requests that a D.C Superior Court Search Warrant be issued for the entire premises located at 3411 A St. SE #203 in Washington D.C. To seize any and all firearms, magazines, ammunition, holsters, scopes/laser aiming devices, firearm accessories, and any other contraband discovered during the search of the aforementioned items or that are observed in plain view.

_____
Affiant

_____
Element

_____
United States Attorney

Subscribed and sworn to before me this _2nd_ Day of _April_, _2008_.

_____
Magistrate
United States District Court

_____
Judge
Superior Court of the District of Columbia

PAGE _4_ OF _4_ PAGES